IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-298

No. COA20-835

Filed 3 August 2021

Hoke County, Nos. 17 JA 71-73, 18 JA 52

IN THE MATTER OF: E.A.C., P.A.C., J.M.C., and J.C.-B.

Appeal by respondent-mother from orders entered 25 March 2020 and 18 September 2020 by Judge Warren McSweeney and Judge Regina M. Joe respectively in Hoke County District Court. Heard in the Court of Appeals 9 June 2021.

*Parent Defender Wendy C. Sotolongo, by Deputy Parent Defender Annick Lenoir-Peek, for appellant-respondent-mother.*

*The Charleston Group, by Jose A. Coker, R. Jonathan Charleston, and Charles R. Smith, for petitioner-appellee Hoke County Department of Social Services.*

*Matthew D. Wunsche for petitioner-appellee Guardian ad Litem.*

ARROWOOD, Judge.

¶ 1 Respondent-mother appeals from a ninety-day review order and two permanency planning orders. Respondent-mother contends the trial court erred in setting a permanent plan that did not include reunification, that the Hoke County Department of Social Services ("DSS") failed to provide reasonable reunification efforts, and that the trial court could not grant guardianship of the children to foster

parents without a finding that respondent-mother was unfit or had acted inconsistently with her constitutionally protected status. For the following reasons, we vacate the trial court's orders and remand for a new hearing.

## I.     Background

¶ 2        In July 2015, respondent-mother was shot in the head by her ex-boyfriend. The shooting caused respondent-mother to suffer a traumatic brain injury. On 8 October 2017, respondent-mother began acting erratically. Respondent-mother's brother called law enforcement officers and respondent-mother was hospitalized overnight due to suicidal ideations.

¶ 3        On 9 October 2017, DSS received a report alleging improper supervision, improper discipline, and an injurious environment involving J.M.C. ("Julieta"), P.A.C. ("Patricio"), and E.A.C. ("Emmanuel").[1] DSS observed injuries to Julieta's face. Although respondent-mother denied causing the injuries, Julieta, Patricio, and Emmanuel attributed the injuries to respondent-mother striking Julieta in the nose with a knife. DSS and respondent-mother entered into a Safety Agreement dated 9 October 2017. As part of the Safety Agreement, respondent-mother agreed to seek domestic violence services and engage in mental health services. DSS sought to place

---

[1] Pseudonyms are used throughout the opinion to protect the identity of the juveniles and for ease of reading. The parties have stipulated to the aforementioned pseudonyms. All four children are at times referenced collectively as "juveniles."

Julieta, Patricio, and Emmanuel with their maternal uncle. On 19 December 2017, the Cumberland County Department of Social Services notified DSS of pending criminal charges against the maternal uncle for sexual abuse.

On 20 December 2017, DSS filed petitions alleging Julieta, Patricio, and Emmanuel as dependent and neglected under N.C. Gen. Stat. §§ 7B-101(9) and 7B-101(15). DSS placed Julieta, Patricio, and Emmanuel in the care of Shanley and Theresa Morgan ("Morgans"). On 10 July 2018, by consent of all parties, the trial court appointed respondent-mother a Guardian *ad litem* ("GAL") under N.C. R. Civ. P. 17 due to her traumatic brain injury. On 29 October 2018, the trial court adjudicated Julieta, Patricio, and Emmanuel as dependent and neglected. The trial court filed a continuance order on 3 December 2018 keeping Julieta, Patricio, and Emmanuel in DSS custody.

On 3 December 2018, the UNC Medical Center in Chapel Hill notified DSS of J.C.-B.'s ("Juliana") birth. At the time of Juliana's birth, respondent-mother did not have stable housing or gainful employment. DSS also received information that respondent-mother had attempted to coordinate an illegal adoption of Juliana. On 5 December 2018, DSS filed a petition alleging Juliana as dependent and neglected. DSS obtained nonsecure custody of Juliana and placed her with the Morgans along with her older siblings. On 1 February 2019, the trial court adjudicated Juliana as dependent and neglected.

¶ 6      The trial court conducted four hearings during the dispositional phase: 15 March 2019, 27 September 2019, 6 March 2020, and 19 June 2020.

¶ 7      At the 15 March 2019 hearing, respondent-mother entered into an Out of Home Family Services Agreement ("OHFSA") in which she agreed to: (1) maintain stable employment or income to care for the needs of the juveniles; (2) participate in parenting classes; (3) maintain stable housing; (4) participate in mental health therapy; and (5) visit the juveniles to maintain a bond. DSS recommended a primary plan of reunification with a concurrent plan of guardianship to a court-approved caretaker, which the trial court adopted in the disposition order. Disposition for all four children was entered on 25 March 2019.

¶ 8      DSS encountered several barriers in respondent-mother's achieving the primary plan of reunification. While conducting a home study of respondent-mother's residence, DSS observed several issues, including wiring hanging from the ceiling, holes in the floor, scattered debris throughout the house, lack of proper heating, and an insufficient number of beds for the juveniles. Additionally, respondent-mother's status as an undocumented immigrant created difficulty in obtaining employment and participating in parenting classes. DSS referred respondent-mother to Catholic Charities of Raleigh's office in Fayetteville to assist respondent-mother in applying for U Nonimmigrant Status as a victim of a violent crime ("U Visa"). Respondent-

mother did not file an application or provide the necessary documentation to secure a U Visa.

¶ 9 In July 2019, respondent-mother contacted DSS to execute Relinquishments of Minor for Adoption ("Relinquishments") for the juveniles. Respondent-mother did not have counsel present, and upon receiving the unsolicited request, DSS advised respondent-mother to confer with her counsel. After respondent-mother conferred with her attorney, respondent-mother requested to independently proceed with the Relinquishments. DSS provided respondent-mother with Relinquishments in Spanish and explained their ramifications. Respondent-mother signed the Relinquishments of her own volition and free will.

¶ 10 The next hearing was conducted on 27 September 2019. The trial court set aside the Relinquishments upon respondent-mother's motion to have them rescinded. The trial court set aside the Relinquishments because respondent-mother's GAL was not present at the time of the signatures. In the order setting aside the Relinquishments, the trial court found that DSS had not forced, coerced, or threatened respondent-mother to sign the Relinquishments.

¶ 11 After addressing the Relinquishments, the trial court proceeded with the review hearing. At the time of the hearing, Julieta, Patricio, and Emmanuel had been in DSS custody for 646 days, and Juliana for 296 days. At the hearing, DSS recommended changing the primary plan for Julieta, Patricio, and Juliana from

reunification to guardianship and changing the concurrent plan from guardianship to custody.[2]  Respondent-mother's trial counsel objected to the proposed change in primary and concurrent plans.  Over respondent-mother's objection, the trial court changed the primary plans for Julieta, Patricio, and Juliana to guardianship with a court-approved caretaker with a concurrent plan of custody to a court-approved caretaker.  The Ninety Day Review Order was entered 4 November 2019.

¶ 12        Based on respondent-mother's failure to complete the requirements of her OHFSA, DSS requested to be relieved of further reunification efforts.  DSS contacted multiple providers to assist respondent-mother with employment and housing services but failed to obtain assistance due to respondent-mother's undocumented status.  DSS contacted TT&T Services ("TT&T") in Raeford, North Carolina regarding parenting classes.  TT&T did not have a Spanish-speaking service provider, and Julieta, Patricio, and Emmanuel did not meet TT&T's age criteria.  DSS also contacted the Cooperative Extension Parents as Teachers program.  Respondent-mother did not meet the program's criteria for services because the juveniles did not reside with respondent-mother and some were over the age of five.

¶ 13        DSS also contacted several service providers to assist respondent-mother in obtaining mental health services with a Spanish-speaking therapist, including

---

[2] Emmanuel's primary plan was not changed because DSS was awaiting the results of a paternity test.

TT&T, Greater Visions Behavioral Health, Renew Counseling Center of Raeford, and Daymark Recovery Center ("Daymark"). Daymark refused to provide services to respondent-mother due to her undocumented status. DSS also attempted to schedule therapy for respondent-mother at the Hoke County Health Department, but services were unavailable due to respondent-mother's undocumented status.

¶ 14    After these unsuccessful attempts to obtain assistance, DSS transported respondent-mother to the Catholic Charities of Raleigh's office in Fayetteville to seek assistance in applying for a U Visa. DSS provided an interpreter to assist at the appointment. At the appointment, respondent-mother was informed that the U Visa application required her to obtain birth certificates for all of her children, including those born in Mexico, and to provide financial or employment statements so that service fees could be waived. Respondent-mother did not provide the required documentation and her U Visa application was never processed.

¶ 15    DSS also attempted to assist respondent-mother in obtaining neurological services. DSS scheduled an appointment for respondent-mother at the Duke University School of Medicine Department of Neurology ("Duke Neurology") in Durham, North Carolina. DSS intended to use reunification funds to financially assist respondent-mother with the services at Duke Neurology. DSS was informed that Duke Neurology would not provide services due to respondent-mother's undocumented status.

¶ 16 The trial court found that respondent-mother had not achieved stable housing, employment, participated in parenting classes, or mental health services as required by the OHFSA. The trial court relieved DSS of further reunification efforts to respondent-mother in the 4 November 2019 review order.

¶ 17 The next permanency planning hearing was conducted on 6 March 2020. At the time of the hearing, Julieta, Patricio, and Emmanuel had been in DSS custody for over 808 days, and Juliana for 450 days. On 25 March 2020, the trial court entered a permanency planning order granting guardianship of Patricio, Julieta, and Juliana to the Morgans.[3] In the permanency planning order, the trial court found that respondent-mother had waived her constitutionally protected status because she never provided DSS with the documentation required to obtain a U Visa and because she had not acquired stable housing throughout the pendency of the cases. Apart from respondent-mother's inability to complete her OHFSA, the Morgans provided permanence for the juveniles. The Morgans provided for the juveniles' medical and educational needs, and the juveniles established a strong bond with the Morgans, enjoying their own bedrooms and vacations together.

¶ 18 The last permanency planning hearing regarding Emmanuel was conducted on 19 June 2020. Although an assessment was completed on the home of a paternal

---

[3] Emmanuel's case was bifurcated from his siblings due to the aforementioned paternity test.

uncle in Indiana, the trial court received evidence that Emmanuel feared being removed from the Morgans and separated from his siblings. The trial court determined that it was in Emmanuel's best interest to remain with the Morgans. The trial court found that respondent-mother had waived her constitutionally protected status because she never provided DSS with the documentation required to obtain a U Visa and because she had not acquired stable housing throughout the pendency of the case. The permanency planning order granting guardianship of Emmanuel to the Morgans was entered 18 September 2020.

¶ 19        Respondent-mother filed written notices of appeal on 30 June 2020 and 23 September 2020. On 28 July 2020, respondent-mother filed a petition for *writ of certiorari* to review the 4 November 2019 Ninety Day Review Order.[4] This Court allowed respondent-mother's petition on 17 August 2020.

## II.     Discussion

¶ 20        Respondent-mother raises several arguments on appeal. First, respondent-mother contends the trial court should not have acted as if it was holding a permanency planning hearing because the hearing was noticed as a review hearing and respondent-mother's trial counsel objected. Second, respondent-mother argues the trial court operated under a misapprehension of law by "eliminat[ing]

---

[4] Respondent-mother's petition for *writ of certiorari* was filed prior to the pendency of this appeal and is docketed under No. P20-417.

reunification efforts at a first review hearing," by setting "a permanent plan which did not include reunification," and by telling trial counsel that the trial court was not obligated to "list what the [respondent-m]other had to do to regain custody of her children." Third, respondent-mother argues that DSS failed to provide reasonable reunification efforts and the trial court's findings are not supported by competent evidence. Finally, respondent-mother contends the trial court's finding that respondent-mother acted inconsistently with her constitutionally protected status was contrary to the evidence presented.

### A. Notice of Hearing

There is a sequential process for abuse, neglect, or dependency cases, wherein each required action or event must occur within a prescribed amount of time after the preceding stage in the case. *In re T.R.P.*, 360 N.C. 588, 593, 636 S.E.2d 787, 791-92 (2006). An adjudicatory hearing must be held no later than 60 days after the filing of a petition, and an initial dispositional hearing follows the adjudication. N.C. Gen. Stat. §§ 7B-801(c), 7B-901 (2019). A review hearing must be "held within 90 days from the date of the initial dispositional hearing . . . [and] at least every six months thereafter." N.C. Gen. Stat. § 7B-906.1(a) (2019). "Within 12 months of the date of the initial order removing custody, there shall be a review hearing designated as a permanency planning hearing." N.C. Gen. Stat. § 7B-906.1(a). Hearings after an initial permanency planning hearing are automatically designated as permanency

planning hearings. N.C. Gen. Stat. § 7B-906.1(a). Prior to a review hearing, the clerk "shall give 15 days' notice of the hearing and its purpose" to parents and other parties. N.C. Gen. Stat. § 7B-906.1(b). Although the Juvenile Code has established a sequential hearing process, courts may combine and conduct the adjudicatory, dispositional, and permanency planning hearings on the same day. *In re C.P.*, 258 N.C. App. 241, 244, 812 S.E.2d 188, 191 (2018).

¶ 22     While dispositional hearings can be combined, a court cannot enter a permanency planning order at a hearing for which proper notice was not given, unless proper notice is waived. *In re S.C.R.*, 217 N.C. App. 166, 171, 718 S.E.2d 709, 713 (2011). "[A] party waives its right to notice under section 7B-907(a)[5] by attending the hearing in which the permanent plan is created, participating in the hearing, and failing to object to the lack of notice." *In re J.P.*, 230 N.C. App. 523, 526, 750 S.E.2d 543, 545 (2013) (footnote omitted) (citing *In re J.S.*, 165 N.C. App. 509, 514, 598 S.E.2d 658, 662 (2004)).

¶ 23     Respondent-mother argues the trial court erred in conducting a permanency planning hearing without providing adequate notice of the proceedings. We disagree. Respondent-mother attended and participated in the hearings on 15 March 2019 and 27 September 2019 and at the latter hearing objected to the proposed change in

---

[5] N.C. Gen. Stat. § 7B-907(a) was repealed effective 1 October 2013 and recodified as N.C. Gen. Stat. § 7B-906.1(b).

permanent plan but made no objection to holding a permanency planning hearing. Because respondent-mother attended and participated in the hearings and failed to object to the lack of notice, we hold that respondent-mother waived her right to notice under N.C. Gen. Stat. § 7B-906.1(b).

### B. Elimination of Reunification Efforts & Misapprehension of Law

¶ 24     Respondent-mother raises three issues with respect to the trial court's permanency planning order: (1) the trial court erred in eliminating reunification efforts in an initial review hearing; (2) the trial court erred in setting a permanent plan that did not include reunification; and (3) the trial court misapprehended the law and its judicial role in stating that it was not obligated to "list what the [respondent-m]other had to do to regain custody of her children." Because the first two issues are intertwined, we discuss them together.

### 1. Eliminating Reunification at Initial Hearing

¶ 25     At the permanency planning stage involving a neglected juvenile, the trial court must adopt concurrent permanent plans consisting of a primary and secondary plan. N.C. Gen. Stat. § 7B-906.2(a), (b) (2019). If determined to be in the juvenile's best interest, the trial court can adopt two of the six statutory plans, including adoption, guardianship, reinstatement of parental rights, and reunification. N.C. Gen. Stat. § 7B-906.2(a). When deciding which plans to impose, Chapter 7B instructs the trial court as follows concerning reunification:

> At any permanency planning hearing, the court shall adopt concurrent permanent plans and shall identify the primary plan and secondary plan. Reunification shall be a primary or secondary plan unless the court made findings under G.S. 7B-901(c) or G.S. 7B-906.1(d)(3), the permanent plan is or has been achieved in accordance with subsection (a1) of this section, or the court makes written findings that reunification efforts clearly would be unsuccessful or would be inconsistent with the juvenile's health or safety. The finding that reunification efforts clearly would be unsuccessful or inconsistent with the juvenile's health or safety may be made at any permanency planning hearing. Unless permanence has been achieved, the court shall order the county department of social services to make efforts toward finalizing the primary and secondary permanent plans and may specify efforts that are reasonable to timely achieve permanence for the juvenile.

N.C. Gen. Stat. § 7B-906.2(b).

¶ 26　　The trial court must also make findings "which shall demonstrate the degree of success or failure toward reunification," including:

> (1) Whether the parent is making adequate progress within a reasonable period of time under the plan.
>
> (2) Whether the parent is actively participating in or cooperating with the plan, the department, and the guardian ad litem for the juvenile.
>
> (3) Whether the parent remains available to the court, the department, and the guardian ad litem for the juvenile.
>
> (4) Whether the parent is acting in a manner inconsistent with the health or safety of the juvenile.

N.C. Gen. Stat. § 7B-906.2(d). Our Supreme Court has stated in the context of orders ceasing reunification efforts that "[t]he trial court's written findings must address the statute's concerns, but need not quote its exact language." *In re L.M.T.*, 367 N.C. 165, 168, 752 S.E.2d 453, 455 (2013).

> "The essential requirement at the review hearing is that sufficient evidence be presented to the trial court so that it can determine what is in the best interest of the child." In light of this objective, neither the parent nor the county department of social services bears the burden of proof in permanency planning hearings, and the trial court's findings of fact need only be supported by sufficient competent evidence.

*Id.* at 180, 752 S.E.2d at 462 (citations omitted) (cleaned up).

In a permanency planning hearing held pursuant to Chapter 7B, the trial court can only order the cessation of reunification efforts when it finds facts based upon credible evidence presented at the hearing that support its conclusion of law to cease reunification efforts. *In re Weiler*, 158 N.C. App. 473, 477, 581 S.E.2d 134, 137 (2003).

Under N.C. Gen. Stat. § 7B-906.2(b), reunification must be either a primary or secondary plan unless: (1) the trial court makes findings under §§ 7B-901(c) or 7B-906.1(d)(3); (2) the permanent plan is or has been achieved in accordance with § 7B-906.2(a1), or (3) the trial court makes written findings that reunification efforts clearly would be unsuccessful or would be inconsistent with the juvenile's health or safety. N.C. Gen. Stat. § 7B-906.2(b).

¶ 29        In this case, the 15 March 2019 hearing was designated as an initial dispositional hearing but became a combined dispositional and permanency planning hearing. In the 25 March 2019 disposition order, the trial court adopted "the primary plan of reunification and the concurrent plan of guardianship to a court-approved caretaker, as these plans of care for establishing permanency for the Juveniles at this time[.]" Accordingly, because reunification was part of the initial permanent plan, respondent-mother's argument that the trial court could not as a matter of law eliminate reunification at the subsequent 27 September 2019 hearing is without merit.

¶ 30        Under *In re C.P.*, "a trial court can cease reunification efforts at the first permanency planning hearing if necessary findings of fact were made that showed reunification would be unsuccessful" or would be inconsistent with the juvenile's health or safety. *In re C.P.*, 258 N.C. App. at 245, 812 S.E.2d at 191. Here, the trial court made the following relevant findings of fact:

> 54. The primary plan for [Patricio, Julieta, and Juliana] shall be changed from reunification concurrent with guardianship to a court-approved caretaker to guardianship with a court-approved caretaker concurrent with custody to a court-approved caretaker, *as this is the best plan to achieve a safe and permanent home for [Patricio, Julieta, and Juliana] within a reasonable time.*
>
> . . . .

58.   [Respondent-m]other has remained available to [DSS], the Court, and the Juveniles' GAL.

59.   [Respondent-m]other's efforts to obtain the U Visa by obtaining information about her children was not completed by [respondent-m]other.

60.   The placement of the Juveniles with [respondent-m]other within the next six (6) months is *unlikely* due to the inability of [DSS] to establish services for [respondent-m]other due to her immigration status and the unavailability of services for [respondent-m]other in the Spanish language.

61.   Return to the Juveniles' home would be contrary to their health and safety.

(emphasis added).  The trial court also concluded as a matter of law that it would "be in the best interests of the Juveniles" that DSS be authorized to make decisions on behalf of the juveniles, for their care and placement to remain the responsibility of DSS, and for DSS to arrange or provide for foster care or other suitable placement for the juveniles, and that "[i]t would be contrary to the welfare and best interest of the Juveniles to return to the home of any of the Respondents."

¶ 31       In order to cease reunification efforts and remove reunification as a primary or secondary plan, the trial court was required to make necessary findings of fact that showed reunification would be unsuccessful or inconsistent with the juveniles' health or safety.  Although the trial court's findings of fact do provide that changing the primary plan was "the best plan to achieve a safe and permanent home for [the juveniles] within a reasonable time[,]" and that returning "to the Juvenile's home

would be contrary to their health and safety[,]" the findings do not provide that reunification would be "clearly unsuccessful" as required by N.C. Gen. Stat. § 7B-906.2(b). Instead, the findings provide that placing the juveniles with respondent-mother within the next six months would be "unlikely."

¶ 32 With respect to the findings required by N.C. Gen. Stat. § 7B-906.2(d), the trial court found that respondent-mother had remained available to the Court, DSS, and GAL, but did not specifically address the other three required findings. Rather than addressing whether respondent-mother was making adequate progress within a reasonable period of time, whether respondent-mother was actively participating in or cooperating with the plan, or whether respondent-mother was acting in a manner inconsistent with the health or safety of the juveniles, the trial court simply stated that DSS was "unable to assist [respondent-m]other in accomplishing the issues addressed in her [OHFSA] due to the unavailability of services that can or will work with [respondent-m]other[,]" and that respondent-mother had not completed her efforts to obtain a U Visa.

¶ 33 These findings are insufficient to demonstrate the degree of success or failure towards reunification. The findings only demonstrate that DSS was unable to locate any services that could help respondent-mother progress towards reunification and that respondent-mother was unable to make progress towards reunification because she was unable to obtain a U Visa. We hold the trial court erred in removing

reunification as a primary or secondary plan and in ceasing reunification efforts without making sufficient findings of fact. We vacate the trial court's orders and remand for further proceedings.

### 2. Misapprehension of Law

"Reversal is warranted where a trial court acts under a misapprehension of the law." *In re M.K.*, 241 N.C. App. 467, 475, 773 S.E.2d 535, 541 (2015). "[W]here it appears that the judge below has ruled upon [a] matter before him upon a misapprehension of the law, the cause will be remanded . . . for further hearing in the true legal light." *In re S.G.V.S.*, 258 N.C. App. 21, 24, 811 S.E.2d 718, 721 (2018) (citation omitted).

We review an order ceasing reunification to determine "whether the trial court abused its discretion with respect to disposition." *In re J.H.*, 373 N.C. 264, 267, 837 S.E.2d 847, 850 (2020) (citations omitted). "An abuse of discretion occurs when the trial court's ruling is so arbitrary that it could not have been the result of a reasoned decision." *In re N.G.*, 186 N.C. App. 1, 10-11, 650 S.E.2d 45, 51 (2007) (quoting *In re Robinson,* 151 N.C. App. 733, 737, 567 S.E.2d 227, 229 (2002)), *aff'd*, 362 N.C. 229, 657 S.E.2d 355 (2008).

Respondent-mother contends that the trial court erred in stating "I don't think it's my position and authority to lay out the specific acts that your client has to do or should do" because under N.C. Gen. Stat. § 7B-904, "the trial court is authorized to

enter dispositions that clearly spell out what a parent needs to do to regain custody." DSS cites N.C. Gen. Stat. § 7B-904 in asserting that "the court is authorized to direct certain orders to parents, but the court's authority is limited by the Juvenile Code." DSS further notes that an OHFSA had been in place since 2018 delineating the steps required for respondent-mother to regain custody of the juveniles.

¶ 37 We hold that the trial court exercised its discretion in choosing to decline enumerating specific requirements, and further hold that the trial court did not abuse its discretion in doing so. Respondent-mother was aware of and attempting to participate in the OHFSA at the time of the hearing, and any injury caused by the trial court's decision to not lay out the specific acts required of respondent-mother was harmless.

## C. Remaining Arguments

¶ 38 Respondent-mother further contends the trial court's findings are not supported by any competent evidence because DSS failed to provide reasonable reunification efforts, and that the trial court could not grant guardianship of the children to the Morgans without a finding of unfitness or that respondent-mother acted inconsistently with her constitutionally protected parental status. Because we vacate the trial court's orders on other grounds, it is unnecessary to address respondent-mother's remaining arguments.

## III. Conclusion

For the forgoing reasons, we hold that respondent-mother waived any objection to notice of the permanency planning hearings and that the trial court did not err in establishing reunification as a permanent plan at the initial hearing. We further hold that the trial court erred in ceasing reunification efforts and removing reunification as a permanent plan because the permanency planning order did not contain sufficient findings of fact. We vacate the trial court's orders and remand for a new permanency planning hearing.

VACATED AND REMANDED.

Judges TYSON and INMAN concur.